[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15539
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cr-20005-ASG-4

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

ERNESTO CORTES-CASTRO,

Defendant-Appellant.

_____

No. 11-15682
Non-Argument Calendar
_____

D.C. Docket No.  1:11-cr-20005-ASG-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBERTO CORTES-CASTRO,

Defendant-Appellant.

_____

No. 11-15892
Non-Argument Calendar
_____

D.C. Docket No.  1:11-cr-20005-ASG-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ISRAEL CORTES-MORALES,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(March 7, 2013)

Before WILSON, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Ernesto Cortes-Castro, Alberto Cortes-Castro, and Israel Cortes-Morales

appeal their sentences of 180 months of imprisonment for conspiring to traffic

2

women to engage in commercial sex acts by force or coercion.  18 U.S.C.

§ 1594(c).  Ernesto, Alberto, and Israel challenge the reasonableness of their

sentences and the award of restitution.  We affirm.

The Department of Homeland Security learned that Ernesto, Alberto, Israel,

and a coconspirator were smuggling women from Mexico into the United States,

where they were forced to become prostitutes.  A grand jury returned a superseding

indictment that charged Ernesto, Alberto, and Israel with conspiring to traffic

women for prostitution by force or coercion, id., and with trafficking V.D. for

prostitution by force or coercion, id. §§ 2, 1591(a), (b), and that charged Ernesto

with trafficking C.E. for prostitution by force or coercion, id., and with

transporting C.E. in interstate and foreign commerce with the intent that she

engage in prostitution, id. §§ 2, 2421.

Ernesto, Alberto, and Israel entered identical agreements to plead guilty to

the charge of conspiracy in exchange for the dismissal of their other charges.  The

plea agreements contained joint recommendations that the district court calculate

the defendants' sentences using a base offense of 34, United States Sentencing

Guidelines Manual § 2G1.1(a)(1) (Nov. 2010); that they receive a three-point

reduction for their acceptance of responsibility, id. § 3E1.1(a); and that they

receive a sentence within the advisory guidelines range.  The agreement provided

that the district court could depart from the advisory guidelines range and impose a

3

sentence up to the maximum statutory sentence of imprisonment for life.  The district court accepted the defendants' guilty pleas and adopted the recommendation to apply section 2G1.1.

The factual proffer submitted with the plea agreements stated that, between 2002 and December 2010, Ernesto, Alberto, Israel, and others "agreed to establish a sex trafficking and prostitution business in the United States," in which "women would be transported from Mexico . . . into the United States," where they "would be prostituted in exchange for money."  Ernesto, Alberto, and Israel "kep[t] and controll[ed] some of the money that sex clients paid" and they "agreed to use various means of fraud, force, threats of force, and coercion to cause the women to engage in prostitution."  The defendants "agreed to transport women to have sex with clients or to have the women delivered to brothels" where they "would stay . . . for a week or two having sex with clients."  The women were "required to have sex with between 20 and 40 men each night," and "[e]ach client paid about $30 for 15 minutes of sex."  The defendants "kept some money and sent the rest to family members in Mexico via international money wire services."  "[T]he defendants[] and co-conspirators[] often discussed their prostitution business, how to increase profits, and how to control their prostitutes."

The factual proffer stated that "[s]everal victims" of the conspiracy "would have testified at trial" about how Ernesto, Alberto, and Israel snared their victims.

The defendants "would romantically court their victims in Mexico" and, after "establish[ing] emotional connections," they would urge the women to "mov[e] to the United States for a better life" and often alluded to "marriage and children," and "[s]ometimes, they even married the women and impregnated them." The defendants encouraged the women to find jobs in the United States and, after smuggling them into the country, they "learned that . . . [they had] to become prostitutes and give the defendants the proceeds." None of the women "sp[oke] English, had [any] family in [the United States], [or] had [any] money or immigration papers." And the defendants admitted to using various means to force the women to engage in prostitution. "[O]n several occasions, [the women] were ordered not to speak with each other or not to leave the house"; "[t]hey were threatened with being abandoned"; [t]hey were psychologically humiliated"; and "they were harmed or received threats of harm."

The defendants' presentence investigation reports provided that Ernesto, Alberto, and Israel "all equally engaged in the . . . scheme to traffic immigrant women" who "were often forced to have sex with up to 40 men, usually Mexican migrant workers, per night for as little as $25 per man." The reports described how, in 1999, Israel kidnapped S.J.G., forced her to marry him, and smuggled her to New York, where she was forced to work as a prostitute, beaten, and remained penniless. S.J.G. lived with Israel, Ernesto, and Alberto and two women who

similarly had been smuggled into the country to work as prostitutes to undocumented migrant farm workers in New York and in Florida. The three women were not permitted to speak to each other or leave the house alone, and S.J.G. saw Ernesto and Alberto abuse other prostitutes by punching, kicking, and beating them and dragging them down stairs. S.J.G. tried to escape, but Israel caught her, beat her, and locked her in the basement. Israel allowed S.J.G. to visit Mexico for two weeks, but when she stayed longer, Israel kidnapped her, impregnated her, and threatened to take her baby if she did not return to her former life. After a few years, Israel agreed to divorce S.J.G., and she lived in Miami, where she learned about "stash houses" where the defendants concealed their prostitutes. The report also described how Israel transported another victim, V.D., to 10 different locations, where she was required to have sex with 30 to 40 immigrant workers, and how Ernesto and Alberto transported V.D., on three different occasions, to houses where she was forced to have sex with 20 to 25 clients at each location. V.D. received a portion of the money for each act of prostitution. The report mentioned the amount of loss inflicted on four victims: 1) $93,000 by E.G.C.; 2) $310,000 by L.L.S.; 3) $345,000 by D.V.R.; and 4) $311,200 by C.E.

The presentence reports determined the defendants' advisory guideline range based on 13 victims, but later the reports were revised to reflect the decision to

calculate the guidelines range based on one victim.  The initial presentence reports provided an adjusted offense level of 40, see U.S.S.G. §§ 2G1.1(c), 2A3.1, 3D1.4(a), and an advisory guidelines range between 292 and 365 months of imprisonment.  The revised reports used an adjusted offense level of 31 and, with a criminal history of I, provided an advisory guidelines range between 108 and 135 months of imprisonment.

The defendants and the government requested that the district court impose sentences at the high end of the revised guidelines range.  The government presented testimony from six victims about the physical, psychological, and monetary effects of the defendants' crimes.  For example, S.J.G. testified about being forced to perform oral sex on migrant workers who had "feces on their genitals" and being beaten so violently on one occasion that she suffered a loss of eyesight and had to undergo surgery to salvage her vision.  In response to the defendants' objections, the district court said that, "while [it could] consider [the testimonies of the women] as victim statements, they [did] not rise to the level of evidence, so [its] primary concern . . . [was] the factual proffer and the presentence report."

The district court varied upward from the revised guidelines range and sentenced each defendant to 180 months of imprisonment.  The district court explained that the defendants' conduct was "unusually heinous, cruel, brutal and

degrading to each of the victims involved"; "the recommendation for sentencing [was] insufficient to address the nature and degree of each of [the sentencing] factors"; and the sentence recommended did not "afford[] adequate deterrence to the serious crime of human trafficking for prostitution." The district court stated that it gave "significant weight" to the nature and circumstances of the defendants' crimes and their histories, 18 U.S.C. § 3553(a)(1), and to deterring "the serious crime of human trafficking for prostitution," id. § 3553(a)(2)(B).

Later, the government submitted a memorandum in support of its request for restitution contending that the amount of loss to each victim should be based on the profit derived from her forced prostitution, plus any specific damages, and less any compensation received. Five victims submitted declarations detailing how they calculated their amounts of loss. In the declarations, S.G.J. requested $257,300, L.L.S. requested $310,000, C.E. requested $211,200, D.V.R. requested $316,800, and V.D. requested $607,600.

The defendants did not respond to the memorandum or the declarations. At the restitution hearing, the government revised downward most of the loss amounts requested by the victims and supported its calculations with information from the factual proffer, the presentence reports, and the victims' declarations. The government requested loss amounts for only five victims: $153,300 for S.J.G.;

$310,000 for L.L.S.; $154,400 for C.E.; $299,200 for D.V.R.; and $322,300 for V.D.

The district court credited the calculations of the government and awarded restitution of $1,239,200. The district court explained that restitution was mandated by statute and, "even if . . . discretionary, given the very significant circumstances of this offense[,] . . . restitution [was] required here to address the full amount of the victims' losses." The defendants argued that the victims had exaggerated their losses and that their testimonies and declarations were inconsistent with statements they gave shortly after their release, but the district court found that the declarations were reliable and credible because they were consistent with the factual proffer, the presentence reports, and the victims' testimonies. The district court also found that any inconsistencies in the victims' earlier statements were attributable to "still [being] under the influence of the trauma of [the crimes] and perceived threats of family members."

The district court did not abuse its discretion by sentencing Ernesto, Alberto, and Israel to terms 45 months above the high end of their revised advisory guidelines range. The defendants enslaved, demeaned, and debased immigrant women. The defendants forced their victims for several years to perform sexual activities daily for up to forty men, and they controlled their victims through mental intimidation, maltreatment, and violent physical abuse. The district court

reasonably determined that a sentence above the revised guidelines range was required to address the abhorrent nature and protracted duration of the defendants' crimes and to dissuade them from abusing women in the future. Id. § 3553(a)(1), (a)(2)(B); see United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007) ("The weight to be accorded any given [section] 3553(a) factor is a matter committed to the sound discretion of the district court."). The defendants argue that the upward variance resulted in an "impermissible double-counting" of conduct accounted for under section 2A3.1 of the guidelines, but the district court applied section 2G1.1(a)(1) of the guidelines and, in any event, it reasonably could rely on the egregious circumstances of the defendants' crimes in fashioning an appropriate sentence, see United States v. Amedeo, 487 F.3d 823, 833–34 (11th Cir. 2007). The sentences of 180 months of imprisonment, which were well below the maximum statutory penalty of imprisonment for life, were reasonable. See United States v. Winingear, 422 F.3d 1241, 1244 (11th Cir. 2005).

The district court also did not err in ordering the defendants to pay restitution. By statute, the district court had to compensate these victims of sex trafficking in an amount equaling "the greater of the gross income or value to the defendant of the victim's services or labor" and for their losses attributable to medical services, necessary transportation, housing, child care expenses, and "other losses suffered . . . as a proximate result of the offense." Id. §§ 1593(a),

10

1593(b)(3), 1593(c), 2259(b)(3).  And the district court did not clearly err in crediting the victims' declarations or determining the amount of restitution based on the defendants' admissions to information in the factual proffer and the presentence report.  See United States v. Beckles, 565 F.3d 832, 844 (11th Cir. 2009).  Alberto argues that the order of restitution rewards the victims for their illegal activities, but this argument is preposterous given that his victims were enslaved and forced to prostitute.  The victims of the defendants' sex trafficking crimes were entitled to be "made whole for their losses."  United States v. Huff, 609 F.3d 1240, 1249 (11th Cir. 2010) (quoting United States v. Arutunoff, 1 F.3d 1112, 1121 (10th Cir. 1993)).

We **AFFIRM** the sentences imposed on Ernesto and Alberto Cortes-Castro and Israel Cortes-Morales.